IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KATHLEEN B. MILLER ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 13-1587-GMS |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**MEMORANDUM**

**I.    INTRODUCTION**

The plaintiff Kathleen B. Miller ("Miller") filed this action against defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), on September 20, 2013. (D.I. 1). Miller seeks review of the Commissioner's final decision denying her applications for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act").

Miller filed an application for DIB on January 19, 2010. (Tr. 123-126). Miller's claim was denied initially and upon reconsideration. (Tr. 68, 76). Miller requested a hearing before an Administrative Law Judge ("ALJ") which was held on August 15, 2011. (Tr. 40-65, 82-83). The ALJ issued a decision on August 25, 2011 finding that Miller could perform her past relevant work and, therefore, was not disabled under the Act. (Tr. 22-39). The Appeals Council denied Miller's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 5-10).

Presently before the court are the parties' cross-motions for summary judgment. (D.I. 11, 14). For the foregoing reasons, Miller's motion for summary judgment is denied-in-part and granted-in-part; the Commissioner's motion for summary judgment is granted-in-part and denied-

1

in-part; and the matter is remanded for further findings and proceedings consistent with this Memorandum.

## II. BACKGROUND

### A. Medical History

Miller was born on February 27, 1949. (Tr. 66). She was 60 years old when she applied for benefits. Miller initially alleged disability due to hearing loss and depression. (Tr. 68, 138). She later added that she was also suffering from pain in her back, feet, and arms. (Tr. 167, 175). Following is a summary of Miller's medical history with respect to all the alleged impairments that the ALJ considered.

#### 1. Vertigo / Hearing Loss

Miller developed total hearing loss in the left ear at the age of 44 and has partial hearing loss in the right ear, for which she is prescribed a hearing aid. (Tr. 258). In December 2009, Miller complained to her primary care physician, Dr. Stephen Duggan, of decreased hearing. (Tr. 229-231). Dr. Duggan noted that Miller had a history of hearing loss. (Tr. 229). He instructed Miller to continue with the hearing aids, and noted that her hearing may need to be reevaluated by an ENT. (Tr. 231).

State agency physician William Medford, Jr., M.D., evaluated Miller on March 10, 2010. (Tr. 258). Dr. Medford reported that Miller had excellent speech quality. She experienced great frustration working in noisy environments but did very well in a quiet environment with one-on-one communication. (*Id.*). She had no complaints of significant vertigo or dizziness. (*Id.*).

Miller saw clinical audiologist Rebecca Blaha, M.A., CCC-A on March 16, 2010 for an audiological evaluation. (Tr. 260). Testing confirmed severe sensorineural hearing loss in the right ear and a moderately-severe to profound sensorineural hearing loss in the left ear. (*Id.*).

2

Miller reported that she used a hearing aid and it provided "good benefit." (*Id.*). Testing of the hearing aid verified that it was performing well. (*Id.*). The overall fitting was "optimal." (*Id.*). The clinical audiologist reported that Miller showed "excellent functional ability" with her current hearing aid system. (*Id.*).

On May 19, 2010, Miller was evaluated by her Ear, Nose, and Throat Physician, Dr. Timoteo R. Gabriel, Jr. (Tr. 279). He noted that he had not seen Miller since 2007, and her hearing tests showed similar results compared to the last time he saw her. (*Id.*). Specifically, Miller had severe to profound sensorineural hearing loss in the left ear and moderately severe sensorineural hearing loss in the right ear. (*Id.*). Thus, her ENT exam was "essentially negative." (*Id.*).

### 2.  Back Pain

In December 2009, Miller also complained to Dr. Duggan of back pain and stiffness. (Tr. 229-231). Upon physical examination, Dr. Duggan reported that Miller had the full range of motion for all extremities with normal reflexes, coordination, muscle strength, and tone. (Tr. 230). He prescribed her pain medication. (Tr. 231).

On May 6, 2010, Miller saw Dr. Duggan again for pain "all over." (Tr. 285). Dr. Duggan observed multiple arthalgias, a decreased range of motion in the right shoulder and neck, tenderness in the lower back, and left foot pain with decreased range of motion.[1] (Tr. 285-286). The back pain was eventually diagnosed as lumbago, which is defined as acute or chronic pain in the lower back.[2] An x-ray of the lumbar spine showed sacralization of the L5 vertebrae with mild

---

[1]  Arthralgia is defined as pain in one or more joints. Merriam-Webster's Medical Dictionary, 57, (Revised Ed. 2005).

[2]  Merriam-Webster.com. http://www.merriam-webster.com (December 15, 2015).

scattered endplate spurring, and no appreciable misalignment. (Tr. 284). Dr. Duggan prescribed pain medication and four weeks of physical therapy for the back pain. (Tr. 282, 286).

At the various physical therapy sessions in May 2010, Miller reported decreased overall low back pain and no increased lower back pain with increased activity. (Tr. 361, 363). The physical therapist observed that Miller's gross movements were only mildly limited by pain and stiffness. (Tr. 359, 361, 363).

An MRI of Miller's lumbar spine taken on August 31, 2010 showed no spondylolisthesis, no compression fracture, no abnormal signal, no disc protrusion, and no spinal stenosis. (Tr. 320). There was mild hypertrophy of the ligamentum flava, mild facet overgrowth at L4-L5, and a small annular tear at L5-S1. (*Id.*). A second MRI of Miller's lumbar spine taken on June 3, 2011 was "essentially normal." (Tr. 383). The MRI did not show the previously described annual fissure at L5-S1. (*Id.*). An x-ray of Miller's cervical spine taken in November 2010 was within normal limits. (Tr. 324).

Dr. Duggan referred Miller to Dr. Michael Sugarman, a neurosurgeon, for a consultation on her low back pain. Miller met with Dr. Sugarman on June 16, 2011. (Tr. 384-385). Dr. Sugarman observed that Miller had a fairly good range of motion in her back, but she did complain of discomfort with those maneuvers. He explained that Miller's symptoms were secondary to lumbar spondylosis. He saw no indication for surgical intervention, and recommended instead Ibuprofen and a book outlining abdominal and back strengthening exercises. (*Id.*).

### 3. Shoulder Pain

In September 2010, Miller had a month of physical therapy for her neck and shoulder pain. (Tr. 339-358). At the various physical therapy sessions, Miller reported that she was feeling better (Tr. 341), that she experienced relief after her last visit (Tr. 343), that her right shoulder was getting

4

much better and she had only minor pain in her left shoulder with certain movements (Tr. 345), and that her shoulder and neck felt better (Tr. 347).

An x-ray of Miller's right shoulder taken on November 1, 2010 was deemed a "negative study." (Tr. 323). An MRI of Miller's right shoulder taken on November 17, 2010 showed acromioclavicular arthropathy, but no impingement on the supraspinatus and no tear of the rotator cuff. (Tr. 321).

Miller saw an orthopedic specialist, Dr. Stephen Hershey, on December 7, 2010. (Tr. 377). Dr. Hershey noted that Miller had right shoulder pain for a year; the X-ray looked normal; and an MRI showed bursitis, fluid, and some AC joint arthritis, but no rotator cuff tear. (*Id.*). He prescribed additional pain medications. (*Id.*).

At a follow-up appointment about a week later, Dr. Hershey observed that the right shoulder was "doing a bit better" and Miller was "definitely improving." (Tr. 392). At another follow-up appointment in January 2011, Dr. Hershey noted that the severity level of Miller's right shoulder pain was "moderate" and the problem was "stable." (Tr. 390-91). Miller reported that the pain medication helped some, but she had stopped taking the medication because it bothered her stomach. (*Id.*). Miller requested a shoulder injection instead which Dr. Hershey administered. (*Id.*).

### 4. Foot Pain

On May 11, 2010, Miller saw Dr. Raymond A. DiPretoro, Jr., a podiatrist, for pain in her left and right heels. (Tr. 291). Dr. DiPretoro diagnosed Miller with plantar fascial fibromatosis and treated the pain with injections. (Tr. 291, 297, 300).

At a follow-up appointment on May 25, 2010, Miller reported that the pain in her left heel was "40% improved" and pain in her right heel was resolved. (Tr. 296). Dr. DiPretoro observed

5

that Miller's condition had "improved significantly." (*Id.*). In June 2010, Miller reported that her left heel was "80% improved." (Tr. 299). On July 20, 2010, Miller again reported that her left heel was "80% improved overall but still has significant pain." (Tr. 334). Miller described the pain as a "deep dull ache, exacerbated with ambulation." (Tr. 334).

At each appointment, Dr. DiPretoro discussed various treatment options, including surgery. At her appointment in July 2010, Miller expressed a desire for surgical intervention. (Tr. 335).

### 5. Depression and Anxiety

In January 2010, Miller began mental health treatment with Dr. Susan Epps, a licensed psychologist. (Tr. 241-57). Dr. Epps diagnosed Miller with depression and secondary anxiety. (Tr. 31, Tr. 328).

During a session on July 20, 2010, Miller reported good understanding, an okay memory, and not a lot of trouble with sustained concentration. (Tr. 308). She also reported that she was frustrated easily and her social interaction skills were only okay. (*Id.*). Dr. Epps noted that Miller was wearing a hearing aid and that there were still difficulties in the sessions with hearing. (*Id.*).

### 6. Obesity

Miller testified that at the time of the hearing she was 5' tall and weighed 170 lbs. (Tr. 43). Based on her height and weight, Miller's Body Mass Index ("BMI") is 33.2. (Tr. 27). The Clinical Guidelines issued by the National Institutes of Health define obesity as present in general where an individual's BMI is 30.0 or above. (Tr. 28). The Clinical Guidelines categorize a BMI of 40 or above as "extreme" obesity. (*Id.*). There is no threshold BMI that renders obesity a "severe" impairment for disability purposes.

**B.     Medical Opinions**

**1.     Miller's Primary Care Physician**

In a Medical Statement dated May 25, 2011, Dr. Duggan opined that due to the moderate restrictions between her back and foot problems, Miller was "with medical reason disabled from any work." (Tr. 325-26). Dr. Duggan opined that due to lumbar radiculopathy and planter fasciitis, Miller could stand for 15 minutes at one time, sit for 30 minutes at one time, work 4 hours per day, frequently lift 5 pounds, and occasionally bend and stoop; her pain was moderate; and she had no work capacity. (Tr. 326).

The ALJ afforded Dr. Duggan's opinion "little weight" because it was not supported by the "unremarkable" cervical and lumbar spine imaging studies, normal physical examination findings, and neurological evaluation.[3] (Tr. 33). The ALJ also noted that Dr. Duggan was a family practitioner with no apparent specialty in occupational or orthopedic medicine. (*Id.*).

**2.     Miller's Psychiatrist**

On June 29, 2011, Dr. Epps completed a Mental Impairment Questionnaire about Miller's mental health limitations. (Tr. 328-333). Ultimately, Dr. Epps opined that Miller would have difficulty working at a regular job on a sustained basis due to "significant hearing and physical issues," and she would be absent from work about 3 days per month due to her impairments. (Tr. 333).

Dr. Epps opined that Miller was "seriously limited" in her ability to carry out very short and simple instructions, complete a normal workday and workweek, perform at a consistent pace, deal with normal work stress, interact appropriately with the public, and use public transportation. (Tr. 330-331). According to Dr. Epps, the cause of these serious limitations was Miller's

---

[3] A description of an imagining study as "unremarkable" means the study is either normal or has abnormalities that are of no significance.

difficulties with hearing, bending over, stooping, sitting for long period, and carrying files. (*Id.*). Dr. Epps also noted that Miller had concerns about panic and anxiety. (*Id.*).

Dr. Epps opined that Miller had "limited but satisfactory" ability to understand and remember very short and simple instructions, understand and remember detailed instructions, carry out detailed instructions, sustain an ordinary routine without special supervision, and make simple work-related decisions. (Tr. 330-31).

Dr. Epps found that Miller had no restrictions in her daily living activities, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (*Id.*).

The ALJ gave Dr. Epps opinion "little weight" because it was internally inconsistent, relied primarily on the Miller's hearing impairment, and was not supported by the treatment record. (Tr. 33). For example, Dr. Epps stated that Miller is "seriously limited" in her ability to carry out very short and simple instructions, but she has the "limited but satisfactory" ability to understand, remember, and carry out detailed instructions. (*Id.*). The ALJ did find evidence, however, to support Dr. Epps opinion that Miller has moderate difficulties in maintaining concentration, persistence, or pace. (*Id.*).

### 3. State Agency Reviews

On April 12, 2010 and August 5, 2010, state agency medical consultants reviewed Miller's medical file and completed a Physical Residual Functional Capacity Assessment. (Tr. 273-278; 311-318). The medical consultants determined that Miller had no exertional limitations. (Tr. 32). The ALJ found that, giving Miller every benefit of the doubt and considering her alleged back pain, obesity, and past relevant work, her exertional capacity was "somewhat more limited" than what was assessed by the medical consultants. (*Id.*).

8

On March 22, 2010, Christopher King, Psy.D., a state agency psychiatrist, reviewed Miller's medical file and completed a Psychiatric Review Technique form. (Tr. 262-272). Dr. King considered Miller's mental impairment to be non-severe. (Tr. 32; Tr. 270). The ALJ, however, afforded this opinion "little weight" because additional medical evidence supports a finding that Miller's mental impairments are severe. (Tr. 32).

### C. The Administrative Hearing

#### 1. Miller's testimony

Miller testified that she was terminated from her job as an accountant due to downsizing. (Tr. 44). Although she initially tried to find a new job, Miller was unable to find work. (Tr. 44). She testified that she had difficulty hearing during job interviews. (Tr. 55).

Regarding activities of daily living, Miller testified that she has a driver's license and drives locally. (Tr. 46). She lives with her husband. (Tr. 43). She is able to do laundry after her husband carries it, cook, go grocery shopping with her daughter-in-law or son, spend time reading books, and see her children and grandchildren every week. (Tr. 46-47). Miller admits that she has had anxiety attacks for most of her life. (Tr. 49).

#### 2. VE's testimony

The Vocational Expert ("VE") testified that Miller had past relevant work as a accounts receivable/payable bookkeeper. (Tr. 58). The position is classified as sedentary and a skilled occupation. (Tr. 45). The VE stated that any acquired skills from the bookkeeping position were transferable to only other sedentary, skilled positions, not to semiskilled or light work. (Tr. 59-60).

The ALJ asked the VE to consider several hypotheticals questions based on a hypothetical individual who was 62 years old; had a high school education and a couple of years of college; can read, write, and use numbers; and has a past work history as a bookkeeper. (Tr. 58).

In the first hypothetical, the individual was subject to the following restrictions: light work; able to occasionally stoop, crouch, crawl, squat, kneel, and balance; no hazards such as ladders, scaffolds, dangerous heights and machinery; no exposure to heat or cold, dust, fumes or gases; when communicating with others it is beneficial to wear her hearing aids and for people to speak clearly; no problems following written instructions; able to understand, remember and carry out detailed instructions; able to perform within a schedule, be on time, and produce an adequate amount of work; and interaction with the public is limited to occasional. Based on these restrictions, the vocational expert stated that the individual would be able to perform her past work. (Tr. 59).

In the second and third hypothetical, the individual would have limited light work, standing and walking between two and six hours a day, and sitting six hours in an eight-hour workday. (Tr. 61). The third hypothetical added that the individual would have a sit/stand option. (Tr. 62). Based on these hypotheticals, the VE explained that there were multiple unskilled positions existing in the national economy. (*Id.*).

In the fourth hypothetical, the individual was subject to the following restrictions: does not sleep well; difficult to maintain the same postural positions for very long; absences that would exceed 1-2 days a month more than permitted; problems maintaining time limitation on breaks; some depression and anxiety; and the need to take medication for anxiety. (Tr. 63). The VE responded that, in his opinion, an individual would be considered not employable because they were absent two or more days per month than allowed. (Tr. 63-64). Miller's attorney did not question the VE. (*Id.*).

**D.    The ALJ's Findings**

On August 25, 2011, the ALJ issued an unfavorable decision finding that Miller was not disabled. (Tr. 22-39). Her findings of fact and conclusions of law may be summarized as follows:

- Miller had not engaged in substantial gainful activity since January 19, 2010, the alleged onset date of disability.

- Miller had the following severe impairments: vertiginous syndrome, partial hearing loss, chronic back pain, depression, anxiety, and obesity. Miller's shoulder pain and foot pain were not severe impairments.

- Miller did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

- Miller had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). She can lift and carry 20 pounds occasionally and 10 pounds frequently; walk and sit six hours; and occasionally stoop, crouch, crawl, squat, kneel, and balance. Her work should not involve hazards such as ladders, scaffolds, dangerous heights, and dangerous machinery. She should not be exposed to heat or cold, dust, fumes, or gases on the job. When communicating with others it is beneficial for her to wear hearing aids of for other people to speak clearly. She can understand, remember, and carry out detailed instructions; perform within a schedule and be on time; and compensate for hearing problems by limiting interaction with the general public to occasional.

- Miller is capable of performing past relevant work in accounts receivable/payable. This work does not require the performance of work-related activities precluded by Miller's residual functional capacity (20 CFR 404.1565).

11

- Miller has not been under a disability, as defined in the Social Security Act, from January 19, 2010 through August 25, 2011.

(Tr. 27-34).

### III. STANDARD OF REVIEW

#### A. Reviewing the ALJ's Decision

A reviewing court will reverse the ALJ's findings only if they are not supported by "substantial evidence." 42 U.S.C. § 405(g); *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992). Where the ALJ's findings of fact are supported by substantial evidence, the court is bound by those findings even if it would have decided the case differently. *See Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001). Evidence is considered "substantial" if it is less than a preponderance but more than a mere scintilla. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In determining whether substantial evidence supports the ALJ's findings, the court may not undertake a *de novo* review of the decision, nor may it re-weigh the evidence of record. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).

In Social Security cases, the substantial evidence standard applies to motions for summary judgment brought pursuant to Federal Rule of Civil Procedure 56(c). *See Woody v. Sec'y of the Dep't of Health & Human Servs.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

### IV. DISCUSSION

Miller asserts that the ALJ's decision is flawed on several grounds. First, the ALJ relied on a hypothetical that failed to include the credibly established limitation that Miller had moderate

difficulties with concentration, persistence, and pace. (D.I. 12 at 11-15). Second, the ALJ failed to apply the Medical–Vocational Guidelines. (*Id.* at 15-17). Third, the ALJ erred in failing to find that Miller's foot and shoulder conditions were not severe impairments. (*Id.* at 17-19). Fourth, the ALJ failed to afford adequate weight to the opinion of Miller's treating physician and treating psychiatrist. (*Id.* at 19-25). Finally, the hypothetical question on which the ALJ relied did not comprehensively describe Miller's limitations. (*Id.* at 25-27). Each of these arguments are addressed in turn.

### A. Including the credibly established limitation of moderate difficulties with concentration, persistence, and pace

Miller argues that the hypothetical question, presented to the VE and relied upon by the ALJ, failed to include the credibly established limitation that Miller had moderate difficulties with concentration, persistence, and pace. (D.I. 12 at 11-15). The ALJ found evidence to credibly support that Miller has moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 29, 33). The issue is whether the ALJ took into account this credibly established limitation when concluding that Miller could return to her past relevant work as a bookkeeper.

A hypothetical question presented to the VE must reflect all of the claimant's impairments supported by the record. A hypothetical question omitting credibly established limitations is defective and the answer provided cannot constitute substantial evidence. *See Rutherford*, 399 F.3d at 554.

The ALJ is not required to use the magic words "moderate difficulties in concentration, persistence and pace." *Holley v. Comm'r of Soc. Sec.*, 590 Fed. App'x 167, 168 (3d Cir. 2014). Courts have found that other phrases, such as "simple routine tasks" or "simple instructions," are adequate substitutes. *See McDonald v. Astrue*, 293 Fed. Appx. 941, 946 (3d Cir. 2008) ("simple routine tasks" accurately conveyed moderate limitations in concentration, persistence, and pace);

13

*Menkes v. Astrue*, 262 F. App'x 410, 412 (3d Cir. 2008) (finding that the ALJ also accounted for moderate limitations in concentration, persistence and pace by stating that the hypothetical individual could "understand, remember, and carry out simple instructions").

Here, the VE was not asked to consider "moderate difficulties in concentration persistence and pace" or any limitation that has been recognized as an adequate substitute. Instead, the ALJ presented a hypothetical individual that could "understand, remember, and carry out detailed instructions...." (Tr. 59). The ability to work with "detailed instructions" is not necessarily inconsistent with moderate limitations in concentration, persistence, or pace. *See Russo v. Astrue*, 2010 WL 1872851, at *9 (D. Del. May 10, 2015) (finding that a hypothetical individual may have mental functioning limitations and still be capable of understanding detailed instructions); Tr. 331 (opinion of Dr. Epps that Miller had moderate difficulties in concentration persistence and pace and could understand, remember, and carry out detailed instructions); Tr. 308 (Miller's statement that she had "not a lot of trouble with sustained concentration").

Ultimately, however, the court cannot determine from the record if the ALJ properly included the credibly established limitation of moderate difficulties in maintaining concentration, persistence, or pace in the hypothetical upon which she relied to conclude that Miller could return to past relevant work. "When a hypothetical question is deficient, remand is required." *Pringle v. Astrue*, 2014 WL 2452570, at *12 (D. Del. May 16, 2014). Thus, the court must remand for further clarification on this issue.

### B. Use of the Medical Vocational Guidelines

Miller argues that the ALJ erred in failing to apply the medical vocational guidelines. (D.I. 12 at 15-17). Each claim is evaluated according to a five-step process until a finding of "disabled" or "not disabled" is obtained. *See* § 404.1520. The medical vocational guidelines are employed at

14

step five of the sequential analysis to determine whether a claimant can engage in substantial gainful activity other than her relevant past work. 20 C.F.R. Pt. 404, subpt. P, App 2; *Macera v. Barnhart*, 305 F. Supp. 2d 410, 420 (D. Del. 2004) (explaining that the guidelines are employed at step five). Here, the ALJ concluded her analysis at step four, finding that Miller remained able to perform her past relevant work. Because the ALJ did not continue to step five, she had no need to consult the medical vocational guidelines.

### C. Severity of Miller's foot and shoulder pain

The ALJ found that Miller's plantar fascial fibromatosis and right shoulder pain were not severe impairments. (Tr. 28). According to Miller, these findings were not supported by substantial evidence because there was contrary evidence in the record, including: (i) Miller's hearing testimony that her feet hurt if she walked or stood for more than 15-20 minutes, (ii) Dr. Duggan's opinion that Miller had a moderate restriction due to her foot problem that disabled her from any work, (iii) Dr. DiPretoro's medical recommendation that Miller undergo surgery, and (iv) Miller's reports at various times of moderate shoulder pain.[4] (D.I. 12 at 18-19).

An impairment is considered "not severe" if it involves only a "slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "Any doubt as to whether this showing has been made is to be resolved in favor of the applicant. In short, the step-two inquiry is a *de minimis* screening device to dispose of groundless claims." *Id.* The ALJ has the discretion to weigh any conflicting evidence and reject partially, or even

---

[4] It is not clear from the record that Dr. DiPretoro "recommended" surgery, as Miller claims. Dr. DiPetoro's notes from several appointments state that he "recommended injection." (Tr. 291, 297, 300). There is no similar language regarding surgery. Instead, his notes state that Miller "desires surgical intervention." (Tr. 335).

15

entirely, subjective complaints that are not fully credible. *See* 20 C.F.R. §§ 404.1527(c)(2); *Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974); *Fargnoli*, 247 F.3d at 43.

Substantial evidence supports the ALJ's finding that the plantar fascial fibromatosis was not a severe impairment. As the ALJ noted, the left foot was treated with pain injections; an x-ray study was normal with no evidence of plantar calcaneal spur stress factor; Miller reported by May 25, 2010 that the pain in the right heel was resolved; and Miller reported by July 20, 2010 that the left heel was 80% improved. (Tr. 28).

Similarly, substantial evidence supports the ALJ's conclusion that Miller's right shoulder pain was not a severe impairment. Miller underwent physical therapy, reported that her right shoulder was getting much better (Tr. 345), reported that she had only minor pain in her left shoulder (*Id.*), had an x-ray with a negative study (Tr. 323), had an MRI that showed no impingement on the supraspinatus and no tear of the rotator cuff (Tr. 321); and obtained the treatment of an orthopedic specialist who noted that the right shoulder was definitely improving and the problem was stable (Tr. 391-392).

### D. Adequate weight to Dr. Duggan and Dr. Epps opinions

Miller takes issue with the weight the ALJ gave to the opinions of Miller's treating physician, Dr. Duggan, and treating psychiatrist, Dr. Epps. The court finds, however, that the weight the ALJ gave to these opinions is supported by substantial evidence and not contrary to the law.

#### 1. Dr. Duggan

Miller contends that the ALJ should have given controlling weight to Dr. Duggan's opinion that Miller was disabled from any work due to back and foot pain. Generally, the ALJ must give controlling weight to a treating physician's opinion only if the opinion "is well-supported by

16

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 1527(c)(2). Even though her treating physician, Dr. Duggan, opined that Miller was "disabled," the opinion is not dispositive. *Perry v. Astrue*, 515 F. Supp. 2d 453, 462 (D. Del. 2007). Only the ALJ can make a disability determination. 20 C.F.R. § 416.927(d).

The court finds that the ALJ did not err in giving Dr. Duggan's opinion little weight because the ALJ's decision was supported by substantial evidence. The record shows that Dr. Duggan reported that Miller had full range of motion of all extremity joints and normal reflexes, coordination, muscle strength, and tone at the time of her initial complaint. (Tr. 230). The physical therapist observed only mild limitations in Miller's gross movements due to back pain. (Tr. 359, 361, 363). The MRI of Miller's cervical spine was normal (Tr. 324), and the MRI of her lumbar spine was essentially normal (Tr. 383). Finally, the neurological consultant, Dr. Sugarman, reported that Miller had a fairly good range of motion in the back, intact lower extremity strength, and normal deep tendon reflexes. (Tr. 384). An ALJ is fully justified in placing greater weight on the opinions offered by medical experts than on the opinions made by plaintiff's family practitioner. *See Konya v. Barnhart*, 391 F. Supp. 2d 273, 288 (D. Del. 2005).

### 2. Dr. Epps

Miller also argues that the ALJ failed to adequately explain why she discounted Dr. Epps opinion. (D.I. 12 at 24). If a treating source's opinion is not given controlling weight, the ALJ must explain her reasons for not doing so. 20 C.F.R. § 404.1527(c)(2). Here, the ALJ explained that she gave Dr. Epp's opinion little weight because it was internally inconsistent, relied primarily on the Miller's hearing impairment, and was not supported by the treatment record. (D.I. 33). This

17

explanation was adequate. Further, the court finds substantial evidence supporting the reasons given by the ALJ.

Dr. Epps stated that Miller was seriously limited in her ability to carry out "very short and simple instructions," but nonetheless had a limited but satisfactory ability to understand, remember, and carry out "detailed instructions." (Tr. Tr. 330-31). An ALJ "is entitled to disregard treating physician opinions that are conclusory, unsupported by the medical evidence, or internally inconsistent." *Harris v. Astrue*, 886 F. Supp. 2d 416, 424 (D. Del. 2012); *see also Timmons v. Colvin*, 6 F. Supp. 3d 522, 535 (D. Del. 2013) (finding that an ALJ did not err in giving less weight to a treating physician's opinion where it was internally inconsistent as well as inconsistent with the record as a whole).

In addition, Dr. Epps' conclusions relied heavily, but not exclusively, on Miller's physical limitations. For example, Dr. Epps opined that Miller would have difficulty working at a regular job on a sustained basis due to "significant hearing and physical issues" (Tr. 333); Miller was seriously limited in a range of functional categories because she could not hear, bend over, stoop, and sit for long periods (Tr. Tr. 330-331); and was seriously limited in interacting appropriately with the general public due to "hearing problems" (Tr. 333). The ALJ is entitled to "give more weight to the opinion of a specialist about medical issues related to his or her area of specialty." *See* § 404.1527(c)(5). Thus, the ALJ was entitled to give more weight to other specialists, such as the neurosurgeon or ENT, who opined on the degree to which Miller's physical limitations would impair her ability to work.

Miller correctly points out that Dr. Epps opinion was not solely based on Miller's hearing loss. (D.I. 12 at 24). Dr. Epps also noted Miller's "concerns anxiety and panic." (Tr. 330). But,

18

the ALJ did not completely reject Dr. Epps opinion. She gave it "little weight." Thus, the ALJ appropriately considered those portions of Dr. Epps opinion supported by substantial evidence.

### E. Incomplete Hypothetical.

Finally, the court rejects Miller's argument that the ALJ posed an incomplete hypothetical to the VE because she: (i) rejected the opinions of Dr. Duggan and Dr. Epps, (ii) failed to include Miller's plantar fascial fibromatosis and right shoulder pain as severe impairments, and (iii) failed to properly consider whether Miller could adequately perform her past relevant work with her hearing loss. (D.I. 12 at 26). As explained above, the ALJ did not err in giving little weight to the opinions of Miller's treating physicians and in finding that Miller's foot and shoulder pain were not severe. Thus, the ALJ's hypothetical was not incomplete in those respects. Further, the ALJ's hypothetical did not fail to properly consider Miller's hearing loss. The ALJ included in her hypothetical question that "when communicating with others it is beneficial to wear her hearing aids and for people to speak clearly" and "interaction with the public is limited to occasional." (Tr. 59). Accordingly, the ALJ's hypothetical was not incomplete for the reasons Miller claims.

## V. CONCLUSION

For the foregoing reasons, (1) Miller's motion for summary judgment is denied-in-part and remanded-in-part; and (2) the Commissioner's motion for summary judgment is granted-in-part and remanded-in-part. This matter is remanded for further administrative proceedings consistent with this opinion.

Dated: December 29, 2015

UNITED STATES DISTRICT JUDGE